**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

WARTSILA NORTH AMERICA, INC. and § 
WARTSILA FINLAND OY, §
 §
*Plaintiffs*, §
 §
v. § CIVIL ACTION H-18-1531
 §
INTERNATIONAL CENTRE FOR §
DISPUTE RESOLUTION and THE HARTFORD §
STEAM BOILER INSPECTION AND §
INSURANCE COMPANY, §
 §
*Defendants*. §

## MEMORANDUM OPINION AND ORDER

Pending before this court are (1) a motion to dismiss filed by defendant International Centre for Dispute Resolution, a division of the American Arbitration Association, Inc. ("ICDR") (Dkt. 23); and (2) a motion to dismiss filed by defendant Hartford Steam Boiler Inspection and Insurance Company ("Hartford") (Dkt. 24). Having considered the motions, responses, replies, and the applicable law, the court is of the opinion that both motions (Dkts. 23, 24) should be GRANTED.

## I. BACKGROUND

The plaintiffs in this case, Wärtsilä North America, Inc. ("Wartsila NA") and Wärtsilä Finland Oy ("Wartsila Finland") (collectively, "Wartsila"), seek a declaration that the parties do not have an agreement to arbitrate with the ICDR or American Arbitration Association ("AAA") and an injunction prohibiting the defendants from proceedings with a currently-pending ICDR arbitration. Dkt. 19. Wartsila NA is in the business of servicing power plant engines in North America. *Id.* According to Wartsila, the city of Raton, New Mexico, was at some point a member of the Arkansas River Power Authority ("ARPA"). *Id.* Wartsila NA entered into a contract with ARPA on or about

May 6, 2002, to supply ARPA with a reciprocating engine to be used at a power plant in Raton (the "Equipment Supply Contract"). *Id.* On or about October 1, 2004, Wartsila and ARPA entered into another agreement for Wartsila to provide spare parts and maintenance for the power plant in Raton (the "Maintenance Agreement"). *Id.* In 2008, Raton and ARPA had a dispute relating to Raton's payment of its share of costs for ARPA's projects. *Id.* Seemingly as a result of a settlement of that dispute, Raton ceased its membership in ARPA in 2009. *Id.* Raton also purchased the engine in the power plant that Wartsila had sold to ARPA. *Id.* It purchased the engine "as-is" under an asset purchase agreement (the "Asset Purchase Agreement"). *Id.*

Approximately two years later, Raton Public Service ("RPS"), which is Raton's publicly-run electric company, requested a cost estimate from Watsila NA for the performance of inspection and maintenance services on the engine. *Id.* Wartsila NA provided a proposal on or about March 7, 2012. *Id.* Wartsila NA claims that Raton accepted the proposal (the "Inspection Contract"), which included accepting Wartsila's 2011 Terms and Conditions, including a term requiring that disputes be arbitrated before the International Court of Arbitration of the International Chamber of Commerce (the "ICC") and take place in Paris, France. *Id.* Wartsila claims that it completed its work under the Inspection Contract on September 10, 2012. *Id.* On or around October 2012, the engine and facility housing the engine suffered damage.[1] *Id.*

On January 31, 2014, Hartford, which is an insurer and subrogee for Raton and RPS, along with Raton and RPS, initiated an arbitration with the AAA/ICDR[2] against Wartsila NA and Wartsila

---

[1] Hartford contends the equipment lasted only eight days and then suffered catastrophic failure, sending debris flying at high rates of speed, but that nobody was hurt. Dkt. 24 at 3.

[2] Hartford, Raton, and RPS initiated the arbitration with the AAA in Denver, Colorado; the ICDR is the AAA's international division. Dkts. 19, 23, 24.

Finland. *Id.*; Dkt. 19-2, Ex. 6 (statement of claim). This statement of claim asserted breach of contract, breach of express and implied warranties, negligence and gross negligence, failure to warn, products liability, fraud or fraudulent inducement, breach of the duties of good faith and fair dealing, duties of care, trust, full disclosure and/or loyalty, and/or fiduciary duties, quantum meruit, unjust enrichment, promissory estoppel, and negligent misrepresentation. Dkt. 19; Dkt. 19-2, Ex. 6. In support of the ICDR's jurisdiction, the claimants identified a dispute resolution clause from the Maintenance Agreement between ARPA and Wartsila NA. Dkt. 19.

Wartsila claims that the terms of the Maintenance Agreement are inconsequential since Raton is not a party to the agreement and the only parties that can enforce that agreement are the named parties. *Id.* It asserts that the Maintenance Agreement specifically states that neither party can assign any of its rights under the contract without the written consent of the other party, and ARPA never asked Wartsila to consent to an assignment of the agreement to Raton. *Id.* Additionally, Wartsila points out that the agreement does not include Wartsila Finland, so even if an assignment to Raton were valid, the agreement does not bind Wartsila Finland. *Id.*

Wartsila notes in its complaint that the arbitration claimants allege that two additional contracts—the Equipment Supply Contract between ARPA and Wartsila NA and the Inspection Contract between Raton and Wartsila NA—authorize the arbitration. *Id.* Wartsila contends that neither of these contracts confers jurisdiction on the ICDR or AAA as (1) neither Raton nor Wartsila Finland is a party to or contemplated assignee of the Equipment Supply Contract; (2) Wartsila NA did not consent to an assignment of the Equipment Supply Contract to Raton, which is required under the contract; (3) the Inspection Contract's dispute resolution provision does not support ICDR or AAA jurisdiction; and (4) the Inspection Contract does not include Wartsila Finland. *Id.*

In February 2018, Wartsila sent a series of letters to the ICDR addressing these jurisdictional issues. *Id.* On March 8, 2018, ICDR responded that it would proceed with the administration of the arbitration and that any further arguments about jurisdiction should be made to the tribunal, once appointed. *Id.* According to Wartsila, in a letter dated March 12, 2018, the ICDR advised that it relied on the dispute resolution clause found on page 12 of the Maintenance Agreement. *Id.* The ICDR requested that the parties select three arbitrators from a list of fifteen by May 14, 2018. *Id.*

Wartsila filed its complaint and request for injunctive relief against both the ICDR and Hartford in this court on May 11, 2018. Dkt. 1. The defendants filed motions to dismiss the complaint. Dkts. 8, 14. On June 15, 2018, before the court ruled on the motions to dismiss or held a hearing on the request for injunctive relief, Wartsila filed its first amended complaint. Dkt. 19. In the amended complaint, Wartsila requests a declaratory judgment and injunction and asserts claims for tortious interference with contract against all parties and breach of contract against Hartford. Dkt. 19. Hartford and ICDR both filed amended motions to dismiss. Dkts. 23, 24. The ICDR seeks dismissal under the doctrine of arbitral immunity. Dkt. 23. Hartford seeks dismissal under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(3), 12(b)(6), and 12(b)(7). Dkt. 24. These motions are now ripe for disposition. The court will address the ICDR's motion first and then turn to Hartford's motion.

## II.  ICDR

The ICDR contends that the doctrine of arbitral immunity bars all of Wartsila's claims against it and that the ICDR is not a proper party to any dispute between Wartsila and Hartford relating to the enforceability of the arbitration provisions. Dkt. 23. Wartsila contends that immunity does not bar its claims against the ICDR because there is no specific agreement between the parties

to be bound by the ICDR and because there was a clear absence of jurisdiction when the arbitration was initiated. Dkt. 28.

"As with judicial and quasi-judicial immunity, arbitral immunity is essential to protect decision-makers from undue influence and protect the decision-making process from reprisals by dissatisfied litigants. . . . In proper circumstances, organizations that sponsor arbitrations, as well as arbitrators themselves, enjoy this immunity from civil liability." *New England Cleaning Servs., Inc. v. Am. Arbitration Ass'n*, 199 F.3d 542, 545 (1st Cir. 1999). "The arbitrator's 'quasi-judicial' immunity arises from his resemblance to a judge. The scope of his immunity should be no broader than this resemblance." *E.C. Ernst, Inc. v. Manhattan Constr. Co. of Tex.*, 551 F.2d 1026, 1033 (5th Cir. 1977). The arbitrator "should be immune from liability only to the extent that his [or her] action is functionally judge-like." *Id.* "The organizations that sponsor arbitrations are entitled to immunity from civil liability as well with regard to the tasks that they perform that are integrally related to the arbitration." *Jason v. Am. Arbitration Ass'n, Inc.*, 62 F. App'x 557, 2003 WL 1202934, at *1 (5th Cir. Mar. 7, 2003) (unpublished) (citing *New England Cleaning Servs.*, 199 F.3d at 545, and *Hawkins v. Nat'l Ass'n of Sec. Dealers, Inc.*, 149 F.3d 330, 332 (5th Cir. 1998), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562 (2016)).

Wartsila notes in its response to the ICDR's motion to dismiss that while the ICDR "demanded that Hartford and Wärtsilä press forward with the selection of 3 arbitrators from a supplied list of 15 potential arbitrators so the ICDR [could] appoint an arbitration panel" after Wartsila "point[ed] out the clear absence of AAA/ICDR jurisdiction on the face of Hartford's Statement of Claim and accompanying documents," the ICDR later stayed the administration of the arbitration pending this court's resolution of Wartsila's claims. Dkt. 28. The ICDR argues that the intake manager for AAA/ICDR should not be tasked with making a determination regarding whether

there is an enforceable arbitration agreement between the parties, which would be equivalent to having the court's clerk issue of ruling on the jurisdiction of the court. Dkt. 23.

The court finds the First Circuit's opinion in *New England Cleaning Services*, which addressed a similar issue, instructive and persuasive. In *New England Cleaning Services*, the district court dismissed New England Cleaning Services' complaint for an injunction and damages against the AAA. 199 F.3d at 543. New England Cleaning Services had sought an injunction to stop the AAA from proceeding to arbitrate a labor dispute. *Id.* New England Cleaning Services claimed that there was no valid agreement to arbitrate. *Id.* New England Cleaning Services had terminated the collective bargaining agreement under which the parties agreed to arbitrate grievances, and the union asserted that New England Cleaning Services had improperly terminated the collective bargaining agreement. *Id.* at 544. The union eventually filed a demand for arbitration with the AAA, and New England Cleaning Services wrote a letter to the AAA asserting that there was no collective bargaining agreement and thus the AAA lacked jurisdiction. *Id.* AAA continued to proceed toward arbitration and sent New England Cleaning Services a bill. *Id.* New England Cleaning Services filed suit against the AAA and the union in federal court. *Id.* After an evidentiary hearing, the district court held that New England Cleaning Services had properly terminated the collective bargaining agreement and that, thus, the issue of the existence of the agreement was not arbitrable. *Id.* However, it also dismissed the complaint against the AAA on the ground that its decision to continue processing the claim was protected by arbitral immunity. *Id.*

On appeal, the AAA argued that "arbitral immunity protect[ed] its processing of a facially valid demand for arbitration pursuant to a collective bargaining agreement that names it as the arbitral agency." *Id.* The union, in its demand for arbitration, had argued that New England Cleaning Services improperly terminated the agreement and attached a copy of the agreement that

6

called for arbitration with AAA. *Id.* at 545. The First Circuit noted that a "sponsoring organization's immunity extends to the administrative tasks it performs, insofar as these are integrally related to the arbitration." *Id.* It found that the administrative tasks the AAA performed, including selecting an arbitrator, "were sufficiently related to the arbitration to be protected by immunity." *Id.* It instructed that judicial immunity applies unless there is a "clear absence" of jurisdiction and that there was "no reason not to adopt the same parameter for arbitral immunity." *Id.* at 545–46. It found that the papers provided to the AAA "were not so deficient on their face as to signal a 'clear absence' of jurisdiction." *Id.* at 546. The court reasoned that "[a]dopting [New England Cleaning Services'] position would require arbitral organizations, not courts or arbitrators, to themselves resolve what might well turn out to be significant threshold legal issues long before any hearing." *Id.* New England Cleaning Services had claimed that the jurisdictional answer was so obvious that the AAA should have been able to dispose of it routinely, but the First Circuit determined that it was "abundantly clear that the resolution of the arbitrability issue was not facially obvious." *Id.* It noted that the course the AAA followed allowed the issue to be decided by an arbitrator. *Id.*

The relevant question for courts following the reasoning in *New England Cleaning Services* is whether the resolution of the arbitrability issue is facially obvious. If it is not facially obvious, then immunity should apply to the administrative stages prior to an official appointment of an arbitrator or panel or arbitrators.

Here, in the Statement of Claim, Raton and Hartford contended that Raton is a member of ARPA. Dkt. 19-2, Ex. 6 at 1. They stated that Raton, in conjunction with ARPA, requested proposals for the installation of power equipment at RPS. *Id.* at 2. They also stated that "Raton and/or ARPA on Raton's behalf and [Wartsila NA and Wartsila Finland] entered into a contract" for

Wartsila to install its product in 2002 and that in 2004 "Raton and [Wartsila NA and Wartsila Finland] entered into a contract whereby [Wartsila NA and/or Wartsila Finland] were to provide maintenance for the operation of" the equipment. *Id.* The statement of claim indicated that "[p]ursuant to two contracts pursuant to which Raton and [Wartsila NA and Wartsila Finland] did business, a dispute resolution provision required arbitration with AAA in Colorado." *Id.* at 3.

On February 15, 2018, Wartsila wrote a letter to the ICDR and argued that the initial agreement submitted by Raton and Hartford to support jurisdiction was between parties that were not even named in the arbitration and the agreement could not be assigned without written consent. Dkt. 19-2, Ex. 12.

On February 16, 2018, Raton and Hartford sent a letter responding to Wartsila's February 15 email and asserted that various contracts amongst the parties conferred jurisdiction on the AAA. Dkt. 19-2, Ex. 9. They attached a copy of Wartsila NA's initial proposal and asserted that the arbitration clause in that agreement defines the parties as "Wartsila Group" and "Customer," which is Raton. Dkt. 19-2, Ex. 9 at 1–2. It also lists the "orderer" as "Raton Public Service." Dkt. 19-2, Ex. 9, Ex. 1. It states the proposal is extended under "Wartsila General Terms and Conditions - Service Work (2011)." *Id.* The arbitration provision in the terms and conditions states that claims arising out of the contract should be submitted to arbitration with the International Court of Arbitration of the International Chamber of Commerce (the "ICC") and take place in Paris, France. *Id.* Raton and Hartford argued in this February 16 letter that under the International Arbitration Rules, issues relating to jurisdiction that are raised before the tribunal is constituted should be

"'referred to the tribunal for determination once constituted.'"[3] *Id.* at 2 (quoting the International Arbitration Rules, Rule 19).

On February 16, 2018, Wartsila again wrote to the ICDR stating that Raton and Hartford's letter relied on a contract not in their petition that is "null and void" by its express terms and, at any rate, calls for arbitration with the ICC, not ICDR. Dkt. 19-2, Ex. 13. Wartsila also argued that it would be an "incredible waste of ICDR's and the would-be respondent's time and resources" for the panel to decide arbitrability. *Id.*

On February 23, 2018, Hartford and Raton sent an email to the ICDR stating that there is "no doubt that the AAA has jurisdiction over this matter" and attaching (1) the Equipment Supply Contract; (2) the December 3, 2001 Request for Proposals; (3) the Asset Purchase Agreement between ARPA and Raton; (4) the Maintenance Agreement; (5) an agreement between Raton and Wartsila NA from 2012; and (6) the 2011 terms and conditions. Dkt. 19-2, Ex. 10. Hartford and Raton's counsel advised the "Administrator" that "this is not the simple matter that Respondents claim. Instead, the issues are complex, and Claimants are entitled under fundamental due process to a determination of these issues by a Panel as required by the AAA Rules." *Id.*

- The Equipment Supply Contract is clearly between ARPA as the "Buyer" and Wartsila NA as the "Seller." *Id.* The Equipment Supply Contract calls for arbitration of claims arising out of or relating to that agreement by the AAA. *Id.* ¶ 16.2.1. Another provision of the agreement states that it is "intended for the sole benefit of Buyer and Seller, and there are no third-party beneficiaries other than assignees contemplated by the terms herein." *Id.* ¶ 18.8. Attached to the Equipment Supply Contract is a Seller Performance Guaranty by Wartsila

---

[3] Raton and Hartford also attached an email from February 2014 in which Warsila's counsel advised he hoped the parties could agree to the ICDR since there were "multiple arbitration clauses in play." *Id.*, Ex. 9, Ex. 2.

Finland in favor of ARPA "and its successors and assigns." *Id.*, Ex. 2.2.

- The December 3, 2001 request for proposal states that Raton is a member of ARPA and that "ARPA, in conjunction with Raton, is requesting proposals . . . ." *Id.*

- The Asset Purchase Agreement, dated January 15, 2010, is between ARPA and Raton. Dkt. 19-2, Ex. 4. The assets include the Wartsila engine. *Id.*, Ex. A.

- The Maintenance Agreement, dated October 1, 2004, is between ARPA and Wartsila NA. Dkt. 19-2, Ex. 5. This agreement requires that claims originating under the agreement must be arbitrated with the AAA. *Id.* ¶ 17. In another section, it clearly states that the parties cannot assign obligations under the contract without the written consent of the other party and that there are "no third-party beneficiaries other than assignees contemplated by the terms herein." *Id.* ¶¶ 21–22.

- The 2011 terms and conditions relate to Wartsila's work for a "customer." Dkt. 19-2, Ex. 14, Ex. C. It calls for arbitration of any dispute arising from the contract to be held with the ICC in Paris, France. *Id.*

On February 23, 2018, Wartsila provided "one last statement" on the jurisdiction matter, and it attached the Maintenance Agreement, the March 7, 2012 Proposal, the 2011 terms and conditions, and two letters from Wartsila's counsel to Hartford's counsel. Dkt. 19-2, Ex. 14. It asserted that no claimant was a party to the Maintenance Agreement, there can be no third-party beneficiaries or assignments of the agreement unless there is written consent, and the agreement expired on October 2, 2007. *Id.* It argued that both the 2008 and 2011 terms and conditions call for arbitration with the ICC, not the ICDR. *Id.* The March 7, 2012 Proposal includes the 2008 terms and conditions, which Wartsila contends are inapplicable. Dkt. 19-2, Ex. 14, Ex. B. Regardless, the 2008 terms and

conditions, like the 2011 terms and conditions, call for arbitration of disputes arising from the contract to be arbitrated with the ICC in Paris, France. *Id.*

On February 26, 2018, Wartsila sent a letter asserting that the Equipment Supply Contract does not vest ICDR with jurisdiction because none of the named parties is a party to the Equipment Supply Contract. Dkt. 19-2, Ex. 15. It also asserted that even if the claimants were somehow parties to the contract, the contract requires arbitration under the AAA's construction arbitration rules, not the ICDR. *Id.*

On March 8, 2018, the ICDR advised the parties that it decided to proceed with the administration of the matter in the absence of an agreement by the parties or a court order. Dkt. 19-2, Ex. 16. On April 30, 2018, it requested that the parties choose three arbitrators before May 14, 2018. Dkt. 19-2, Ex. 18. Three days later, Wartsila filed suit against the ICDR and Hartford in this court.

This case was not even in front of the arbitration panel yet and already the parties have made significant arguments pointing to multiple arbitration provisions that may or may not have been assignable. This was not the simple issue that Wartsila suggests. And it is certainly not an issue that seems appropriate to ask an administrator who is tasked with getting the parties to choose the panel to resolve. It is an issue more appropriately considered by the panel. There is not a "clear absence" of jurisdiction, and there is definitely not a "clear absence" of jurisdiction that is so obvious that it could be resolved before the arbitrators are even empaneled. The court finds that the ICDR is protected by arbitral immunity. The ICDR's motion to dismiss is GRANTED, and the claims against the ICDR are DISMISSED.

## III. Hartford

Hartford seeks dismissal under Federal Rules of Civil Procedure 12(b)(1), (2), (3), (6), and

(7). Dkt. 24. It claims that (1) the court lacks general and specific jurisdiction over Hartford; (2) the

court lacks subject matter jurisdiction because the parties delegated the determination of arbitrability

to the arbitrators; (3) this district is an improper venue; (4) Wartsila failed to join necessary parties:

Raton and RPS; and (5) Watsila fails to state a claim for which relief can be granted under Rule

12(b)(6). *Id.* Wartsila objects to all of these arguments. Dkt. 30. The court addresses only subject

matter and personal jurisdiction.

### A.    Subject Matter Jurisdiction

Hartford contends that if, as Wartsila contends, Hartford is bound by the terms of the

Inspection Contract, then the court lacks subject matter jurisdiction because the ICC, and not this

court, has subject-matter jurisdiction. Dkt. 24 at 14. Wartsila agrees that the ICC is the proper

forum for claims between the parties to the Inspection Contract, but it asserts that Hartford is not a

party to the Inspection Contract and cannot enforce its terms.[4] Dkt. 30 at 18.

"Enforcement of an arbitration agreement involves two analytical steps. The first is contract

formation—whether the parties entered in *any arbitration agreement at all*. The second involves

contract interpretation to determine whether *this* claim is covered by the arbitration agreement.

Ordinarily both steps are questions for the court." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d

199, 201 (5th Cir. 2016). However, if the "arbitration agreement contains a delegation clause giving

the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes."

---

[4]    Wartsila notes that its breach of contract claim is in the alternative to its tortious
interference claim and that to the extent the court finds Hartford is entitled to enforce the Inspection
Contract or assert RPS's rights under that agreement, Wartsila NA should likewise be able to recover
damages associated with Hartford bringing claims in the wrong forum. Dkt. 30 at 18–19.

*Id.* "[I]f the party seeking arbitration points to a purported delegation clause, the court's analysis is limited." *Id.* at 202. It must still perform the first step, determining whether there is a valid agreement. *Id.* Then, if the delegation clause evinces an intent to have the arbitrator determine arbitrability, the motion to compel arbitration should be granted. *Id.* However, if "an 'assertion of arbitrability [is] wholly groundless,' the court need not submit the issue of arbitrability to the arbitrator." *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 878 F.3d 488, 495 (5th Cir. 2017) (discussing this "narrow escape valve") (quoting *Douglas v. Regions Bank*, 757 F.3d 460, 463 (5th Cir. 2014)). This is a narrow exception; an "assertion of arbitrability is not wholly groundless if there is a legitimate argument that the arbitration clause covers the present dispute, and, on the other hand, that it does not." *Id.* (citations, quotations, and alterations omitted).

"[P]arties are free to delegate questions to an arbitrator, including questions regarding the validity and scope of the arbitration provision itself." *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 551 (5th Cir. 2018). However, "courts may not assume that parties have agreed to arbitrate threshold questions absent clear and unmistakable evidence of their intent to do so." *Id.* The express adoption of the AAA Rules "presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012).

In *Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*, the Fifth Circuit considered a case in which the defendant moved to dismiss based on an arbitration provision in a confidentiality agreement between the Brittania-U Nigeria, Ltd. ("Brittania") and Chevron U.S.A. Inc. ("Chevron"). 866 F.3d 709, 711 (5th Cir. 2017). Brittania had sued Chevron as well as two additional defendants for fraud, misrepresentation, and tortious interference relating to bids for oil leases in Nigeria. *Id.* The court determined that Chevron and Brittania had clearly and unmistakably delegated

arbitrability, and it then turned to the issue of the two defendants who had not signed the agreement. *Id.* at 714–15. It determined that the delegation of arbitrability applied to them as well, as they were attempting to enforce the agreement against a signatory. *Id.* at 715.

Here, like in *Brittania*, a non-signatory is attempting to enforce the arbitration agreement that was clearly signed by Wartsila NA. Thus, *Brittania* is on point. The court, however, is not convinced that this is a jurisdictional question. In *Brittania*, the Fifth Circuit determined that the parties had contractually agreed to let the arbitrator determine arbitrability, but it did not indicate that there was an issue with the court having the power to make that initial call. Thus, to the extent Hartford relies on *Brittania* for dismissal based on lack of subject matter jurisdiction, the motion is DENIED.

**B.      Personal Jurisdiction**

Turning to personal jurisdiction, the court will first set forth the legal standard, and then it will address general and specific jurisdiction, respectively.

**1.      Legal Standard**

Federal courts are courts of limited jurisdiction. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 710, 102 S. Ct. 2099 (1982). Federal courts sitting in diversity may exercise personal jurisdiction to the extent permitted by the laws of the state in which the court sits. *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424 (5th Cir. 2005) (citing *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997)). The Texas long-arm statute allows jurisdiction to be exercised to the extent allowable under the Due Process clause of the Fourteenth Amendment. *Id.* at 424–25 (citing *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 413-14 (1984)).

When the court rules on personal jurisdiction without an evidentiary hearing, the plaintiff must make a prima facie showing of jurisdiction. The burden then shifts to the defendant to demonstrate that the assertion of jurisdiction would be unfair; however, such demonstrations are rare. *Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999). In deciding whether to exercise personal jurisdiction, the court can consider the entire contents of the record, including affidavits. *Paz v. Bush Engineered Metals, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006).

The Due Process analysis entails a two-part inquiry. *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 786 (5th Cir. 1990). First, "the nonresident defendant purposefully must have established 'minimum contacts' with the forum state such that he invoked the benefits and protections of the forum's laws and thus reasonably could anticipate being haled into court there." *Id.* Second, "circumstances must be such that the exercise of personal jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (citing *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 107 S. Ct. 1026 (1987); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76, 105 S. Ct. 2174 (1985); and *Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071 (5th Cir. 1990)).

Minimum contacts are established through the assertion of either general or specific jurisdiction. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 865 (5th Cir. 2001). If the court has general jurisdiction, it "may hear *any* claim against the defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb*, 137 S. Ct. at 1780. "[O]nly a limited set of affiliations will render a defendant amenable to all-purpose [or general] jurisdiction there." *Daimler AG v. Bauman*, 571 U.S. 117, 137, 134 S. Ct. 746 (2014). "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Id.* For a corporation, "'the paradigm forum for the exercise

of general jurisdiction is . . . one in which the corporation is fairly regarded as at home.'"  *Bristol-Myers*, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924, 131 S. Ct. 2846 (2011)).  The relevant inquiry is whether the corporation's "affiliations with the State are so 'continuous and systematic' as to render [the corporation] essentially at home in the forum state."  *Goodyear*, 564 U.S. at 919 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 317, 66 S. Ct. 154 (1945)).

A court may exercise specific jurisdiction if "the cause of action arises out of a defendant's purposeful contacts with the forum."  *Dalton v. R&W Marine, Inc.*, 897 F.2d 1359, 1361 (5th Cir. 1990) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559 (1980)); *see Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000) (quoting *Burger King Corp.*, 471 U.S. at 472).  "Even a single, substantial act directed toward the forum can support specific jurisdiction."  *Dalton*, 897 F.2d at 1361 (citing *Burger King Corp.*, 471 U.S. 462).  The defendant's contacts with the forum must be more than "random, fortuitous, or attenuated," but even "isolated or sporadic contacts" can support specific jurisdiction "so long as the plaintiff's claim relates to or arises out of those contacts."  *ITL Int'l, Inc. v. Constenla, S .A.*, 669 F.3d 493, 498–99 (5th Cir. 2012) (internal quotation marks omitted).

### 2.    General Jurisdiction

Hartford, relying on the U.S. Supreme Court's requirement in *Daimler AG v. Bauman* that a corporation must be "at home" in a state in order for the state to exercise general jurisdiction, argues that it is not "at home" in Texas and that the court therefore cannot exercise general jurisdiction over it.  Dkt. 24.  Wartsila contends in its amended complaint that Hartford has purposefully availed itself of the privileges of conducting business in Texas as a licensed insurance company, maintains its regional headquarters in Houston, Texas, has its insurance rates and policies

approved by the State of Texas so that it can issue policies to Texas citizens, employs a large number

of Texas citizens, and on information and belief, conducts a significant portion of its overall business

in Texas. Dkt. 19. It asserts that Hartford has not controverted any of these facts and that the court

should therefore take all of these allegations as true and find that they establish that Hartford is

"essentially at home and subject to general jurisdiction in Texas." Dkt. 30 at 20. Wartsila relies on

*Shelter Mutual Insurance Co. v. Dallas County Hospital District*, 366 S.W.3d 858, 863 (Tex.

App.—Dallas 2012, pet. denied), for the proposition that an insurance company obtaining a license

in Texas has "effectively consented to general jurisdiction under the long-arm statute." *Id.* at 20.

Hartford responds that *Shelter* was pre-*Daimler* and that, under *Daimler*, it is not "at home". Dkt. 33

at 2. Wartsila replies that *Shelter* has not been overturned or distinguished and that *Daimler* "did

not in any way cast doubt on a foreign corporation's ability to consent to general jurisdiction by

registering to do business in a particular state." Dkt. 30 at 20. It then points to *Bors v. Johnson &*

*Johnson*, 208 F. Supp. 3d 648, 653 (E.D. Pa. 2016), an Eastern District of Pennsylvania case, to

support its argument that *Shelter* still applies post-*Daimler*. *Id.*

      **a.**    ***Shelter***

In *Shelter*, the Dallas Court of Appeals of Texas considered an interlocutory appeal filed by

an insurer when the trial court denied the insurer's special appearance. 366 S.W.3d at 860. The

insurance company ("Shelter") asserted that it had insufficient contacts with Texas to be subject to

general jurisdiction. *Id.* It had provided insurance to Oklahoma residents who were involved in an

accident with a third party, and a Texas hospital where the third party was treated sued Shelter for

the bills associated with the third party's treatment. *Id.* at 861. The hospital contended that Shelter

was subject to general jurisdiction because it was licensed to do business in Texas and thus had

sufficient minimum contacts. *Id.* The trial court and the Dallas Court of Appeals agreed. *Id.* The

Court of Appeals noted that its determination hinged on the affidavits filed by Shelter in support of its special appearance. *Id.* at 862. One of the affidavits established that the accident occurred in Oklahoma and that the insurance policy was issued to Oklahoma residents through an Oklahoma agent. *Id.* It did not negate the allegation by the plaintiff that Shelter was licensed in Texas. *Id.* The other affidavit noted that Shelter was domiciled in Missouri and operated in several different states. *Id.* It indicated that the company owned no real property in Texas and did not have a Texas office or employees. *Id.* It also had ceased writing direct insurance policies in Texas over thirty years prior, but it did provide reinsurance coverage to seventeen Texas companies. *Id.* These premiums amounted to 0.40 percent of the net premiums earned by Shelter. *Id.* at 863. The court noted that Shelter "failed to negate that it maintains a license to do business in Texas and systematically conducts business in Texas with Texas insurance companies." *Id.* The court stated that "[u]nder the long-arm statute, Texas courts can exercise personal jurisdiction over a nonresident defendant who 'does business' in Texas." *Id.* (citing Tex. Civ. Prac. & Remedies Code Ann. § 17.042 (West 2008), and *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (noting that Texas may exercise jurisdiction over a foreign parent if the relationship between the companies "is one that would allow the court to impute the parent corporation's 'doing business' to the subsidiary" (citing *Hargrave v. Fibreboad Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)).

      **b.**    ***Daimler***

In *Daimler*, the plaintiffs brought suit in California and premised jurisdiction over DaimlerChrysler Aktiengesellschaft ("Daimler"), a German company, on the contacts of its U.S. subsidiary, Mercedes-Benz USA, LLC ("MBUSA"). 571 U.S. at 121. MBUSA is incorporated in Delaware, and its principal place of business is New Jersey. *Id.* However, it distributed Daimler-manufactured vehicles to dealerships in California. *Id.* The plaintiffs asserted that the court had

general or all-purpose jurisdiction and that the exercise of jurisdiction was thus appropriate under the Due Process Clause even though none of the events alleged in the complaint occurred in California.  *Id.*  The Court first reminded that in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S. Ct. 2846 (2011), it held that a court may only exercise general jurisdiction over a corporation if the corporation is "'essentially at home in the forum State.'" *Id.* at 122 (quoting *Goodyear*).  It determined that even if it "were to assume that MBUSA is at home in California, and further to assume MBUSA's contacts are imputable to Daimler, there would still be no basis to subject Daimler to general jurisdiction in California, for Daimler's slim contacts with the State hardly render it at home there." *Id.* at 136.  It pointed out that it had held in *Goodyear* that for a corporation, "the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" *Id.* at 137 (quoting Brilmayer et al., A General Look at General Jurisdiction, 66 Tex. L. Rev. 721, 735 (1988)).  It noted that *Goodyear* did *not* hold that a corporation is *only* subject to general jurisdiction in states where the corporation is incorporated or has its principal place of business, but that there is no general jurisdiction unless the corporation's "' affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'" *Id.* at 139 (quoting *Goodyear*, 564 U.S. at 919).

The court did not "foreclose the possibility that in an *exceptional* case . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State," but pointed out that Daimler's activities did not approach that level.  *Id.* at 761 n.19 (emphasis added) (citing to *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 72 S. Ct. 413 (1952), as an example of an "exceptional" case).  The Court reasoned that if Daimler's California activities were sufficient to allow general jurisdiction, then "the same global reach would presumably be available in every other

State in which MBUSA's sales are sizable. Such exorbitant exercises of all-purpose jurisdiction would scarcely permit out–of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id.* at 761–62 (quoting *Burger King Corp.*, 471 U.S. at 472)). Thus, under *Daimler*, the court may not exercise general jurisdiction in a state in which a corporation is not either incorporated or has its principal place of business unless it is an exceptional case where the corporation's contacts are so continuous and systematic as to render the corporation essentially at home in that state, much like the mining company in *Perkins*, which conducted its operations out of Ohio temporarily when it could not operate in the Philippine Islands during World War II. *See Perkins*, 342 U.S. at 448. In this case, the jurisdictional allegations do not present such an exceptional case.

### c.    *Bors*

Wartsila, nevertheless, urges the court to follow *Shelter*'s exercise of general jurisdiction when an insurance company is "doing business" in Texas, even though "doing business" and being "at home" are not similar standards. It uses *Bors v. Johnson & Johnson* to advocate for this position. The Eastern District of Pennsylvania considered *Daimler* when it decided *Bors v. Johnson & Johnson*. The *Bors* plaintiff alleged that Johnson & Johnson's baby powder caused ovarian cancer. 208 F. Supp. 3d at 650–51. The court noted that over twenty-five years ago its Court of Appeals (the Third Circuit) had held that companies that register as foreign corporations in Pennsylvania were subject to personal jurisdiction in Pennsylvania. *Id.* at 650 (relying on *Bane v. Netlink, Inc.*, 925 F.2d 637, 641 (3d Cir. 1991)). It considered registering as a foreign corporation to be a type of consent to jurisdiction and determined that the *Daimler* holding was thus not on point. *Id.* The court pointed out that when businesses registers in Pennsylvania, they are notified that registering enables the commonwealth to exercise general jurisdiction over the corporation. *Id.* at 652.

*Bors* would be on point if this court were located in Pennsylvania and or there was evidence that Hartford consented to general jurisdiction when it registered to do business in Texas. But here, there is no evidence or allegation that registering in Texas involves consent to general jurisdiction, and the word "consent" is not even used in *Shelter*.[5] Instead, the *Shelter* court relied on its determination that the defendant's contacts with Texas were "continuous and systematic," not that they were "so continuous and systematic as to render it essentially at home" in Texas. *Compare Shelter*, 366 S.W.3d at 861, *with Daimler*, 571 U.S. at 139.

Here, Wartsila contends Hartford is licensed in Texas, maintains its regional headquarters in Houston, Texas, has its insurance rates and policies approved by the State of Texas so that it can issue policies to Texas citizens, employs a large number of Texas citizens, and on information and belief, conducts a significant portion of its overall business in Texas. Dkt. 19. Hartford has not controverted theses assertions with affidavits and instead argues that, taking these allegations as true, these contacts are not sufficient for the exercise of general jurisdiction under *Daimler*. The court agrees. None of these allegations amounts to the *exceptional* type of case discussed by the *Daimler* court, and the court therefore finds that it may not exercise general jurisdiction over Hartford.

### 3. Specific Jurisdiction

The court now turns to specific jurisdiction. The court will first discuss the specific jurisdiction allegations contained in the amended complaint, and then it will set forth the parties' arguments relating to specific jurisdiction and determine whether the exercise of specific jurisdiction over Hartford is appropriate in this case.

---

[5] While the State of Texas possibly has similar communications with companies that are licensed here, the court has not been presented with that scenario and makes no determination as to whether the exercise of general jurisdiction would be appropriate under those facts.

### a. Jurisdictional Allegations in the Amended Complaint

Wartsila alleges in its amended complaint that the Inspection Contract, entered into between Wartsila NA and RPS, was negotiated, formed, and partially performed in Houston, Texas, and is governed by Texas law.[6] Dkt. 19. It asserts that the Inspection contract requires all disputes arising from the agreement be brought in an arbitration with the ICC in Paris, France. *Id.* Additionally, Wartsila alleges that Hartford, as subrogee for RPS, "stands in the shoes of its insured" in connection with seeking to enforce RPS's contractual rights and, in breach of the terms of the Inspection Contract, it initiated arbitration with the AAA/ICDR in Denver, Colorado, by and through its attorneys in Dallas, Texas. *Id.* Wartsila alleges that Hartford thus purposefully directed its activities at a Texas resident—Wartsila NA—and caused it harm in Texas. *Id.* It contends that the costs associated with having to participate in this "unjustified arbitration" and "having to file this federal court action" are actual damages resulting from this breach. *Id.*

### b. Hartford's Arguments

Hartford contends that the court lacks specific jurisdiction because (1) Wartsila fails to state a claim for breach of contract and intentional interference with contract, so there can be no specific jurisdiction with regard to these claims; (2) claims over which the court does not have subject-matter jurisdiction cannot support specific contacts; and (3) the Inspection Contract and the alleged breach of it do not constitute specific contacts with Texas. Dk. 24.

---

[6] Wartsila contends, conclusorily, in its complaint that the contract was partially performed in Houston, Texas. However, it attached the contract to its pleading, and the contract calls for the inspection and maintenance of an engine located in New Mexico. *See* Dkt. 19-1, Ex. 3. For instance, a service engineer needed to re-grease the turning gear drive shaft and replace engine-mounted fuel gas filter cartridges. *Id.* It is unclear what aspect of the contract was performed in Texas.

### c. Wartsila's Arguments

Wartsila argues that the court should exercise specific jurisdiction over Hartford because (1) Hartford, from its home office in Texas, directed and caused its Texas lawyer to hale a Texas citizen into arbitration for which no contract exists, causing Wartsila NA harm in Texas; (2) Hartford tortiously interfered with Wartsila NA's (a Texas citizen) rights in a contract negotiated, formed, and performable in part in Texas (the Inspection Contract), causing Wartsila NA harm in Texas; and (3) Hartford, standing in the shoes of RPS, breached Wartsila NA's (a Texas citizen) contract that was negotiated, formed, and performable in part in Texas and requires the application of Texas law, causing Wartsila NA harm in Texas. Dkt. 30 at 11. Wartsila asserts that Hartford bears the burden of presenting a "compelling case" that the exercise of jurisdiction would violate due process, and it has not done so. *Id.* (citing *Burger King*, 471 U.S. at 477–78)

### d. Hartford's Contacts

The court's specific jurisdiction analysis starts and ends with Hartford's argument that its contacts with Texas do not support specific jurisdiction. Hartford argues that a nonresident contracting with a Texas resident is not a sufficient contact to subject the nonresident to the forum's jurisdiction. Dkt. 24 at 14. Additionally, while taking issue with Wartsila's assertion that the Inspection Contract requires the application of Texas law, Hartford asserts that even if it did, that is not enough to create specific jurisdiction in Texas. *Id.* at 15. Finally, Hartford argues that Wartsila's argument that the location of Wartsila's lawyers supports specific jurisdiction is "spurious and not supported by any authority." *Id.* Hartford asserts that its lawyers merely filed an arbitration electronically with the AAA, which is a citizen of New York, and they could have done so from anywhere in the world. *Id.* at 16. Hartford also asserts that Wartsila's contention that it was injured in Texas is insufficient to support specific jurisdiction. *Id.*

Hartford relies on *Holt Oil & Gas Corp. v. Harvey*. In *Holt Oil*, which was a breach-of-contract case, the Fifth Circuit determined that the following contacts were insufficient to support specific jurisdiction: (1) the defendant entered into a contract with the plaintiff, a Texas corporation; (2) the defendant sent a final revised agreement from Oklahoma to Texas; (3) the defendant sent three checks to Texas in partial performance of the contract; and (4) the defendant engaged in extensive telephonic and written communication with the plaintiff. 801 F.2d 773, 778 (5th Cir. 1986). The Fifth Circuit noted that "merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Id.* It found it significant that even though the contract was allegedly "cemented in Texas," it specified that Oklahoma law would govern the agreement. *Id.* The material performance of the contract occurred in Oklahoma, and the mailing of payments to Texas did not weigh heavily in the court's analysis. *Id.* Additionally, the communications tied to developing the contract were merely fortuitous because Holt happened to be a resident of the forum. *Id.*

*Holt Oil* is on point to the extent that Wartsila asserts a breach-of-contract claim. However, the alleged breach in this case does not relate to the material performance of the contract, which Wartsila acknowledges it completed in 2012. Rather, it relates to bringing an arbitration in a forum other than the forum specified in the contract—neither of which is Texas. RPS may have reached out to Texas with regard to negotiating the arbitration clause, but it was contracting for a potential arbitration in Paris, France. The court notes that in this case, unlike *Holt Oil*, the contract allegedly called for the application of Texas law.[7] While this is certainly a consideration in the jurisdictional

---

[7] The Inspection Contract states that it "shall be governed by and interpreted in accordance with the laws in force at the registered office of Contractor, excluding the conflict of laws applicable in such jurisdiction." Dkt. 19-1, Ex. 4 ¶ 12.1. Wartsila contends that Wartsila NA is registered to do business in Texas and that its principal office is in Texas, so Texas law applies. Dkt. 30. Hartford asserts that the contract is unclear as to the meaning of "registered office," and since

analysis, it is not determinative. *See Burger King*, 471 U.S. at 481–82 ("Nothing in our cases, however, suggests that a choice-of-law *provision* should be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws' for jurisdictional purposes."); *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 223 (5th Cir. 2012) ("Although the DLSA did contain a Texas choice-of-law clause, that clause alone is not dispositive on the issue of specific personal jurisdiction."). "When combined with other factors, a choice-of-law clause may reinforce a conclusion that a defendant 'deliberate[ly] affiliat[ed] with the forum State and [had] reasonable foreseeability of possible litigation there.'" *Pervasive Software*, 688 F.3d at 223 (quoting *Burger King*, 471 U.S. at 482). Here, the contract potentially called for the application of Texas law, but it was to be applied by an arbitration panel in Paris, France. The court is not persuaded that the possible choice of Texas law equates to purposeful contacts with Texas relating to the claim or that the choice-of-law provision combined with the other alleged contacts in this case presents a prima facie case of jurisdiction. The court finds that there are insufficient contacts with Texas to support personal jurisdiction with regard to the breach of contract claim.

---

Wartsila NA is a Maryland corporation, its "registered office" should by Maryland, not Texas. Dkt. 24. It argues that "registered office" cannot mean any state in which Wartsila is "registered to do business," as Wartsila has office is several different states. *Id.* The court finds that the phrase "registered office," which is not defined in the contract, is ambiguous. *See Tex. Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 846 (5th Cir. 2003) (explaining that an "'ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations.'" (quoting *Am Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003))). It is unclear what the ordinary meaning of the term "registered office" is, as it could mean a place where the company is registered to do business, but it could also mean a place where the company is incorporated. *See* Black's Law Dictionary (9th ed. 2009) (not defining "registered office"). The parties do not cite any authority to support their interpretations. Under Texas law, the determination of the parties' intent with regard to an ambiguous contract term in the non-insurance context is a question of fact. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) ("[I]f the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent.").

The tortious interference claim arises out of the filing of an arbitration, which Wartsila contends interfered with its contract with RPS to arbitrate claims with the ICC in Paris, France. Dkt. 19. The arbitration was filed by attorneys in Texas, but the court finds that fact to be of little consequence. *See Thompson Hine, LLP v. Taleb*, 734 F.3d 1187, 1193 (D.C. Cir. 2013) ("'The mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the resident party's own activities within this jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the District's laws.'" (quoting *Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 812 (D.C. 1976) (en banc))). Hartford (and possibly Raton and RPS) retained the attorneys to file an arbitration in Colorado, so the use of Texas attorneys does not indicate Hartford was purposefully availing itself of the benefits and protections of Texas laws. Wartsila contends that it was harmed in Texas, but this vague financial harm suffered by the plaintiff in Texas is also insufficient to support specific jurisdiction. *See, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 290–91, 134 S. Ct. 1115 (2014) (reminding that the proper focus in the "minimum contacts" analysis in an intentional tort case is "'the relationship among the defendant, the forum, and the litigation.'" (citing *Calder v. Jones*, 465 U.S. 783, 788, 104 S. Ct. 1482 (1984))). "[I]t is the defendant, not the plaintiff or third parties, who must create contacts with the forum State." *Id.* at 291. "[T]he foreseeability of causing injury in Texas . . . is not a 'sufficient benchmark' for specific jurisdiction." *Panda Brandywine Corp.*, 253 F.3d at 869 (quoting *Burger King Corp.*, 471 U.S. at 474). Rather, Hartford must have "purposefully availe[ed] itself of the privilege of conducting activities" in Texas, *Burger King Corp.*, 471 U.S. at 475, and there is no indication that Hartford's Texas connections in this case are more than fortuitous.

The court finds that Wartsila has not presented a prima facie case of specific jurisdiction with regard to the breach of contract and tortious interference claims. The other claims stem from these

26

claims; thus, Hartford's contacts relating to the other claims also do not support personal jurisdiction. The court need not consider Hartford's other jurisdictional arguments or its other grounds for dismissal. Hartford's motion to dismiss for lack of personal jurisdiction is GRANTED. Wartsila's claims against Hartford are DISMISSED WITHOUT PREJUDICE.

## IV. CONCLUSION

The ICDR's motion to dismiss (Dkt. 23) is GRANTED. Wartsila's claims against the ICDR are DISMISSED WITH PREJUDICE.

Hartford's motion to dismiss (Dkt. 24) is GRANTED. Wartsila's claims against Hartford are DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction.

The court will enter a final judgment concurrently with this memorandum opinion and order.

Signed at Houston, Texas on August 14, 2018.

_____
Gray H. Miller
United States District Judge